# UNITED STATES DISTRICT COURT FOR

# THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SERVICE EMPLOYEES )
INTERNATIONAL UNION, )
1800 Massachusetts Avenue, NW, )
Washington, D.C. 20036, )
                       )
     Plaintiff, )
                       )
     v. )        Civil Action No. 21-2443
                       )
NATIONAL LABOR RELATIONS BOARD; )
LAUREN MCFERRAN, Chair, )       **COMPLAINT FOR**
JOHN RING, Board Member, )       **DECLARATORY JUDGMENT**
MARVIN KAPLAN, Board Member, )     **AND INJUNCTIVE RELIEF**
GWYNNE WILCOX, Board Member, and )
DAVID PROUTY, Board Member )
1015 Half Street, SE )
Washington, D.C. 20570, )
                       )
     Defendants. )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Nicole G. Berner, General Counsel
Claire Prestel, Associate General Counsel
John M. D'Elia, Assistant General Counsel
Service Employees International Union
1800 Massachusetts Avenue, N.W.
Legal Department, Floor 6
Washington, D.C. 20036
(202) 730 – 7168
nicole.berner@seiu.org
claire.prestel@seiu.org
john.delia@seiu.org

Leon Dayan
Adam Bellotti
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street, N.W.
Suite 1000
Washington, D.C. 20005
(202) 842-2600
ldayan@bredhoff.com
abellotti@bredhoff.com

*Counsel to SEIU*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This lawsuit challenges the National Labor Relations Board's Final Rule on *Joint Employer Status Under the National Labor Relations Act*, 85 Fed. Reg. 11184 (Feb. 26, 2020) (to be codified at 29 C.F.R. Part 103 Subpart D) ("Final Rule"), which puts meaningful collective bargaining out of reach for millions of workers by shielding companies that control their jobs from the duty to bargain with them.

2.      The Final Rule is contrary to law, arbitrary and capricious, and must be set aside under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2) because: (1) It prevents the Board from considering an entity's right to control an employee's work when determining whether the entity is a joint employer, contrary to the common law analysis required by the National Labor Relations Act ("NLRA" or "Act"), and (2) it arbitrarily and capriciously excludes health and safety matters from the set of employment conditions over which an entity that exercises control must bargain. The latter error is particularly egregious in the context of the global COVID-19 pandemic; it relieves companies that exercise direct control over health and safety conditions of any obligation to bargain over those conditions with the affected workers' exclusive representative.

3.      For these reasons, Plaintiff Service Employees International Union (SEIU) brings this action for declaratory and injunctive relief under the APA.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C. § 702.

5.      Declaratory and injunctive relief is sought consistent with 5 U.S.C. §§ 705 and 706, and as authorized in 28 U.S.C. §§ 2201 and 2202.

6.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are a United States agency headquartered in this judicial district and its officers sued in their official capacities. Plaintiff is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the District of Columbia.

## PARTIES

7.      Plaintiff SEIU is a labor union with approximately two million members. SEIU's headquarters are located at 1800 Massachusetts Avenue, NW, Washington, D.C. 20036.

8.      Members of SEIU work in industries including janitorial services and health care where the traditional responsibilities of an employer are now frequently split among several different corporate entities. When these employers violate the NLRA, SEIU and its members have a critical interest in holding all the entities involved in the violation responsible for remedying it. Similarly, in collective bargaining, SEIU has a substantial interest in assuring that all parties necessary to reach an agreement are present at the bargaining table, particularly when it seeks to negotiate health and safety protections including from the ravages of COVID 19. In addition, SEIU's affiliate National Fast Food Workers Union – commonly known as the Fight for $15 and a Union – seeks to raise the wages and working conditions of low-wage and vulnerable workers in market sectors, such as the fast-food industry, where certain large employers often attempt to use the franchise model to evade their responsibilities to workers. SEIU has a substantial interest in seeing that all companies who co-determine the terms and

conditions of employment of employees nominally employed by smaller employers are held responsible for their actions.

9.      Defendant Lauren McFerran is the Chair of the NLRB, and Defendants John Ring, Marvin Kaplan, Gwynne Wilcox and David Prouty are Members of the NLRB. Their offices are at 1015 Half Street, SE, Washington, D.C. 20570. They are sued in their official capacity.

10.      Defendant NLRB is an independent agency of the United States government, established by Congress in 1935 for the purpose of administering and enforcing the NLRA.

## ALLEGATIONS
### The Board's History of Adherence to the Common Law When Determining Whether a Joint Employment Relationship Exists

11.      From the earliest days of the National Labor Relations Act, the NLRB has addressed situations where more than one entity is involved in the determination of a group of employees' terms and conditions of employment.

12.      In response to such circumstances, the Board has developed a joint employer doctrine and, at least since passage of the Taft-Hartley Act in 1947, has applied the common law of agency when determining whether an entity's control over workers renders it a joint employer under the NLRA.

13.      The common law of agency requires consideration of the *right* to control another person – even if not exercised – as an elemental factor in determining employer status. The Restatement (Second) of Agency explains that a "master is a principal who employs an agent to perform service . . . and who controls *or has the right to control* the physical conduct of the other." Restatement (Second) of Agency § 2 (1958) (emphasis added). Similarly, a "servant is an agent . . . whose physical conduct in the performance of the service is controlled *or is subject to*

*the right to control* by the master." *Id.* (emphasis added); *see also id.* § 14 cmt. a ("The extent of the *right to control* the physical acts of the agent is an important factor in determining whether or not a master-servant relation between them exists.") (emphasis added).

14.     In *Browning-Ferris Industries of California, Inc. v. NLRB*, 911 F.3d 1195, 1211 (D.C. Cir. 2018), the D.C. Circuit described the "right to control" as "run[ning] like a leitmotif through the Restatement (Second) of Agency" and explained that "'[a]t common law the relevant factors defining the master-servant relationship focus on the master's *control* over the servant,' whether that means the servant 'is controlled or *is subject to the right to control* by the master'." *Id.* at 1211 (emphases in original) (quoting *Clackamas Gastroenterology Associates v. Wells*, 538 U.S. 440, 448 (2003)). These are not just legal terms of art; the right to control can have a determinative effect on working conditions (and workers' lives) in the real world. A company subject to another, larger company's right to control (for example, a janitorial company providing services to a hospital chain) may set working conditions according to what it knows the larger company wants even if the larger company never formally exercises its power to direct the smaller company. This scenario has only become more widespread in recent years as more companies contract out functions once performed in-house, a phenomenon sometimes referred to as the "fissuring" of the workplace.

15.     For decades, the Board ruled consistently with the common law, treating the right to control employees' work and their terms of employment (sometimes known as "reserved control") as probative of joint-employer status. The Board did not require that this right be exercised or that it be exercised in any particular manner. Thus, the Board's joint-employer decisions found it probative that an employer retained the contractual power to reject or terminate workers; set wage rates; set working hours; approve overtime; dictate the number of

workers to be supplied; determine "the manner and method of work performance"; "inspect and approve work"; and terminate the contractual agreement itself at will. *See Browning-Ferris Industries of California, Inc.*, 362 N.L.R.B. 1599, 1607 (2015) ("*BFI*").

16.     Reviewing courts repeatedly endorsed this approach. *See Ref-Chem Co. v. NLRB*, 418 F.2d 127, 129 (5th Cir. 1969); *Ace-Alkire Freight Lines, Inc. v. NLRB*, 431 F. 2d 280, 282 (8th Cir. 1970); *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir. 1985).

17.     Beginning in 1984, however, without explicitly articulating a change in its approach, the Board (contrary to the common law) narrowed its view of the factors to be considered in making a joint employer determination and implicitly repudiated its earlier reliance on reserved control as an indicator of joint-employer status. Then, in *BFI*, the Board comprehensively reviewed its joint employer precedent and returned it to comportment with the common law.

18.     In *BFI*, the Board majority described the Board's then-current standard, which ignored evidence of reserved control, as having "no clear basis . . . in the common law," *BFI*, 362 N.L.R.B. at 1599, and as "undermin[ing] the core protections of the Act" for employees impacted by "the recent dramatic growth in contingent employment relationships." *Id.*

19.     The Board determined that two or more statutory employers are joint employers of the same statutory employees if they share or codetermine those matters governing the essential terms and conditions of employment. In determining whether a putative joint employer meets this standard, the Board stated that the initial inquiry should be whether there is a common-law employment relationship with the employees in question. If this common-law employment relationship exists, the inquiry should then turn to whether the putative joint

employer possesses sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining. *Id.* at 1600.

20.     Specifically, with respect to the question of reserved control, the Board stated that: "Reserved authority to control terms and conditions of employment, even if not exercised, is clearly relevant to the joint-employment inquiry." *Id.* (citation omitted).

21.     In this regard, the Board relied heavily on the Restatement (Second) of Agency, particularly that treatise's discussion of the right to control. The Board highlighted the unambiguous text of the Restatement regarding reserved control, noting that the treatise highlights the "extent of control which, *by the agreement*, the master *may* exercise over the details of the work[,]" a principle which was "impermissibly ignore[d]" by the "joint-employer decisions requiring the exercise of control." *Id.* (emphases in original) (quoting Restatement (Second) of Agency § 220(2) (1958)). As the Board explained in *BFI*, the agency's post-1984 "narrowing of the joint-employer standard" was "never . . . justif[ied]" by "look[ing] to the common law." *Id.* at 1611.

22.     BFI sought review of the Board's new joint employer standard in the U.S. Court of Appeals for the District of Columbia Circuit and the Board filed a cross-application to enforce its decision.

**A New Board, Infected by Conflict of Interest,
Attempts to Deviate from the Common Law**

23.     While *BFI* was pending in the D.C. Circuit, however, the Board's membership changed and a new majority of the Board moved to overrule *BFI*. New NLRB Chairman Philip Miscimarra, who as a Board Member had dissented in *BFI* prior to his being appointed Chairman by President Trump, along with new Board Members Defendant Marvin Kaplan and former

Member William Emanuel, issued a decision in *Hy-Brand Industrial Contractors, Ltd.*, 365

N.L.R.B. No. 156 (2017), wherein the Board overruled *BFI*.

24.     On the issue of reserved control, *Hy-Brand* returned to the Board's pre-*BFI*

approach, holding that "a finding of joint-employer status requires proof that the alleged joint-

employer entities have actually *exercised* joint control over essential employment terms (rather

than merely having 'reserved' the right to exercise control)." *Hy-Brand*, 365 N.L.R.B. No. 156,

at *51.

25.     *Hy-Brand*'s overruling of *BFI* was short-lived, however. Soon after *Hy-Brand*

issued, the NLRB's Inspector General determined that Member Emanuel should have been

recused from the matter because his former law firm represented a party in *BFI* and "*Hy-Brand*

was merely the vehicle to continue the deliberations of [*BFI*]." OIG Rep. Regarding Hy-Brand

Deliberations, NLRB Office of Inspector General (Feb. 9, 2018) *available at*

https://www.nlrb.gov/sites/default/files/attachments/basic-page/node-

1535/OIG%20Report%20Regarding%20Hy_Brand%20Deliberations.pdf. The Inspector General

determined that Emanuel's participation "call[ed] into question the validity of [the *Hy-Brand*]

decision" and constituted a "serious and flagrant problem and/or deficiency in the Board's

administration of its deliberative process." *Id.*

26.     Soon after the Inspector General's determination, the Board vacated *Hy-Brand*

and announced that "the overruling of the *Browning-Ferris* decision is of no force or effect." *Hy-

Brand Industrial Contractors, Ltd.*, 366 N.L.R.B. No. 26 (2018).

27.     Stymied in its effort to overrule *BFI* in *Hy-Brand* and with *BFI* still pending

before the D.C. Circuit, the new Board majority turned to its rarely utilized rulemaking authority

under Section 6 of the Act, 29 U.S.C. § 156. The Board proposed implementing by rule a joint

employer standard essentially identical to the standard that ethics rules prevented it from obtaining via *Hy-Brand*.

28.     On September 14, 2018, the Board published a notice of proposed rulemaking to reinstate *Hy-Brand*'s "actually exercised" "direct and immediate control" test. *The Standard for Determining Joint-Employer Status*, 83 Fed. Reg. 46681 (Sept. 14, 2018).

29.     Former Member Emanuel, whose failure to recuse himself was the Board's basis for vacating *Hy-Brand*, participated in the decision to issue the new proposed rule adopting the same joint employer standard as that contained in *Hy-Brand*.

30.     In June 2018, the Board specifically requested that the D.C. Circuit proceed to decide *BFI*, notwithstanding the Board's plans for a joint-employer standard rulemaking. After issuing its proposed rule, the Board again reiterated its request that the court resolve the pending petitions for review in *BFI*.

31.     On December 28, 2018, the D.C. Circuit issued its decision in *BFI*, holding that "the right-to-control element of the Board's joint-employer standard has deep roots in the common law" and "affirm[ing] the Board's articulation of the joint-employer test as including consideration of . . . an employer's reserved right to control . . . employees' terms and conditions of employment." *Browning-Ferris Indus.*, 911 F.3d at 1199-1200.

32.     In its opinion, the court explained that the NLRB "is bounded by the common-law's definition of a joint employer. The Board's rulemaking, in other words, must color within the common-law lines identified by the judiciary." *Id.* at 1208.

33.     The court then turned to its review of what the common law required. The court concluded that the right to control standard is an established aspect of the common law of agency, and that "[t]he Board's conclusion that joint-employer status considers not only the

control an employer actually exercises over workers, but also the employer's reserved but unexercised right to control the workers and their essential terms and conditions of employment, finds extensive support in the common law of agency." *Id.* at 1209.

34.     The court supported this conclusion with a review of, and citation to, "extensive support" in the common law of agency, including consideration of not only the case law in support of its conclusion but an examination of the Restatement (Second) of Agency as well. *Id.*

35.     On February 26, 2020, shortly after the D.C. Circuit issued its decision in *BFI*, the Board issued its Final Rule. *Joint Employer Status Under the National Labor Relations Act*, 85 Fed. Reg. 11184 (Feb. 26, 2020) (to be codified at 29 C.F.R. Part 103 Subpart D).

36.     The Final Rule, like *Hy-Brand*, provides that an entity is a joint employer of a separate employer's employees only if the two employers possess *and exercise* "direct and immediate control" over essential terms or conditions of employment. *Id.* at 11186.

37.     Notwithstanding the D.C. Circuit's discussion in *BFI* of the extensive common law basis for considering reserved control in the joint employer analysis, the Board's Final Rule expressly limits consideration of reserved control: contractually reserved control over essential terms or conditions of employment factors into the joint-employer analysis "only to the extent [it] supplement[s] and reinforce[s] evidence of the entity's possession or exercise of direct and immediate control over a particular essential term and condition of employment." *Id.*

38.     Thus, under the Final Rule, an employer that has only reserved unexercised control over essential terms and conditions of employment will never be a joint employer, without regard to how comprehensive the scope of the reserved control is or its real-world effect on working conditions.

39.     The rule was approved by only three members of the Board: Defendant then-Chairman Ring, Defendant Member Kaplan and former Member Emanuel. Defendant McFerran's term had expired on December 16, 2019, and the fifth Board Member position was vacant.

40.     The Final Rule included an extended discussion, at 11188-11191, addressing commenters' contentions that all three Board Members had conflicts obligating them to recuse themselves from participation the rulemaking; the Board concluded that recusal was not warranted.

41.     The Final Rule also introduced, for the first time, an "exclusive" list of essential terms and conditions of employment, control over which may render a company a joint employer. Despite the pandemic threat clearly looming on the horizon, the Final Rule (issued February 26, 2020) excluded health and safety conditions from the list of "essential" terms. The Final Rule acknowledged that commenters had urged the agency to include health and safety conditions, but provided no explanation whatsoever for why those conditions were ultimately excluded from the list.

42.     The Final Rule did not explain how its exclusion of health and safety conditions would affect workers facing the looming threat of COVID-19. In fact, the Final Rule did not even *mention* COVID-19, despite the fact that, by that time, the CDC had already publicly confirmed the person-to-person spread of the virus inside the United States. *CDC Confirms Person-to-Person Spread of New Coronavirus in the United States*, Centers for Disease Control (Jan. 30, 2020) *available at* https://www.cdc.gov/media/releases/2020/p0130-coronavirus-spread.html; *see also Shipping of CDC 2019 Novel Coronavirus Diagnostic Test Kits Begins*,

Centers for Disease Control (Feb. 6, 2020) *available at*

https://www.cdc.gov/media/releases/2020/p0206-coronavirus-diagnostic-test-kits.html.

43.     In an April 29, 2020 joint request, Plaintiff SEIU and the AFL-CIO pleaded with

the Board to reconsider the exclusion of health and safety conditions in light of the pandemic's

devastation and continuing threat to workers. The Board "docketed" the request as a petition for

future rulemaking and refused to act further.

## The Rule's First Error Regarding the Right to Control

44.     As previously discussed, the Board's Final Rule precludes consideration of an

unexercised right to control (or reserved control) when making joint employer determinations.

45.     This approach is contrary to the common law, conflicts with national labor policy

as stated in the NLRA, and draws arbitrary and capricious distinctions among employers.

46.     As the D.C. Circuit recognized in *BFI*, when two or more entities are alleged to be

joint employers of the same workers, "[u]nder Supreme Court and circuit precedent, the National

Labor Relations Act's test . . . is determined by the common law of agency." *Browning-Ferris*

*Indus. of California, Inc. v. NLRB*, 911 F.3d 1195, 1206 (D.C. Cir. 2018). The common law of

agency requires consideration of the *right* to control another person–even if not exercised–as an

elemental factor in determining employer status. *See* Restatement (Second) of Agency §§ 2, 220,

14 cmt. a (1958).

47.     Under the NLRB's Final Rule, however, the Board is precluded from considering

such a right when making joint employer determinations. An entity's right to control may *never*

establish joint employer status unless it supports other evidence of actually exercised direct,

immediate, and substantial control. Thus, under the Final Rule, an entity with a reserved right to

control terms and conditions of employment, even if extensive enough to determine real-world

working conditions, can never be a joint employer–contrary to the common law.

48.     In addition to deviating from core common law principles, this aspect of the Final Rule is also contrary to the purpose of the National Labor Relations Act and undermines our nation's labor relations policy as embodied in that Act.

49.     The national labor relations policy of the United States is premised on the idea that the widespread exploitation of individual workers hurts not only those workers but also our economy as a whole.

50.     When Congress enacted the NLRA, it expressly recognized that "[t]he inequality of bargaining power" between unorganized, individual workers and highly organized, corporate employers "depress[es]" those workers' "wage rates and purchasing power" and "prevent[s] the stabilization of competitive wage rates and working conditions . . ." 29 U.S.C. § 151. This, in turn, "aggravate[s] recurrent business depressions" and harms "the flow of commerce." *Id.*

51.     As Congress saw it, workers can redress the inequality that leads to these conditions by joining together in unions and negotiating as a group but not if employers "refus[e] . . . to accept the procedure of collective bargaining" or "den[y] . . . the right of employees to organize." *Id.*

52.     Accordingly, the NLRA declares it to be "the policy of the United States" to "encourage[e] the practice and procedure of collective bargaining" and enshrines in law landmark worker protections and prohibitions on employer conduct to "protect[] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." *Id.*

53.     The Final Rule betrays the Act's fundamental promise by empowering large, highly organized employers to hold control over workers and extract the maximum amount of

profit from their labor while unilaterally opting out of the legal duty to negotiate with their designated union representatives over the terms and conditions under which they work. The Final Rule thereby facilitates exactly what the Act denounces: the "refusal . . . to accept the procedure of collective bargaining." *Id.*; *see also* 29 U.S.C. § 158(a)(5).

54.     Because the Final Rule is in these ways in irreconcilable conflict with the common law and with the NLRA's core purpose, the Rule is "not in accordance with" (and "short of" workers' "statutory right" to bargain with employers under) the NLRA and must be set aside. 5 U.S.C. § 706(2)(A), § 706(2)(C).

55.     The Final Rule's approach to reserved control also draws arbitrary and capricious distinctions among employers.

56.     Under the Rule, a company is a non-employer if it retains control over workers under a contract, but the same company is an employer when it exercises that control.

57.     This distinction is arbitrary and often meaningless for employees in the real world because a nominal employer who understands the wishes of a more powerful client company (e.g., a cleaning contractor serving a building manager or owner) will often set terms and conditions for its employees according to what it knows the client wants, even without that client company having to "exercise" its control in any formal way.

58.     In the real world, a company's reserved control can be extensive enough to effectively dictate working conditions such that conditions may *not change at all* after the company's first formal exercise of control. Yet the Final Rule *turns* on this distinction, even if nothing in a workplace has actually changed.

59.     Because the Final Rule treats entities with authority over terms and conditions of employment as non-employers when their authority is reserved but treats those same entities as

joint employers when the same authority is exercised, the Final Rule is arbitrary, capricious, and

an abuse of discretion and must be set aside under the APA. 5 U.S.C. § 706(2)(A).

### The Rule's Second Error Regarding Health and Safety

60.      Health and safety concerns have historically been of crucial importance to

workers covered by the NLRA.

61.      For example, the seminal case, *NLRB v. Washington Aluminum Co.*, 370 U.S. 9

(1962), in which the Supreme Court addressed concerted activity protected by the Act's Section

7–even in an unorganized workplace where no union was present–involved workers being fired

for walking off the job in protest over unhealthy working conditions: a freezing plant where the

heat was not working on an extraordinarily cold day in the winter.

62.      Writing for the Court, Justice Black recognized the central importance of

collective action by workers to address intolerable, unhealthy working conditions:

> Indeed, concerted activities by employees for the purpose of trying
> to protect themselves from working conditions as uncomfortable as
> the testimony and Board findings showed them to be in this case
> are unquestionably activities to correct conditions which modern
> labor-management legislation treats as too bad to have to be
> tolerated in a humane and civilized society like ours.

*Id.* at 17.

63.      As a more recent example, workers have looked to each other and their unions

during the pandemic for protection from the dangers of exposure to COVID-19 in the workplace.

In many such instances, employees' nominal employer does not control vital safety and health

decisions. The entity actually in control may be a hospital with authority over health and safety

measures for contracted nurses or with authority over the ratio of contracted staff to patients in

circumstances where patients might present a hazard to themselves or caregivers. The entity with

reserved control might also be a nursing home that orders the protected equipment available to

15

contracted staff tasked with disposal of bio-medical waste or a homecare agency that determines the acuity level of patients assigned to contracted home-health aides.

64.     Concerns that entities other than nominal employers often control these crucial matters led to calls for the NLRB to include health and safety conditions among the essential terms and conditions of employment to be considered in its joint employer analysis, in order to ensure that entities making life and death decisions are at the bargaining table when unions seek to negotiate health and safety protections.

65.     In its proposed rule on the joint employer standard, the Board noted that it had never previously specified what essential terms and conditions of employment are relevant to determining joint employer status, and the Board sought comments on whether it should so specify.

66.     In response, a number of commentators, including Plaintiff SEIU's affiliate, 1199SEIU United Healthcare Workers East, urged the Board to include health and safety within a list of essential terms and conditions of employment.

67.     However, in the Final Rule issued on February 26, 2020, where the Board provided for the first time an "exclusive" list of the terms and conditions of employment that it considered "essential" for the joint employer analysis, the Board failed to include safety and health conditions among the "essential" terms and conditions of employment. The Board offered no specific explanation for failing to include safety and health conditions on this list.

68.     On April 20, 2020, Plaintiff SEIU and the AFL-CIO jointly wrote the Board to request that it reconsider its joint employer rule's exclusion of health and safety conditions from among the "essential" terms and conditions of employment and postpone the effective date of the

rule, which was set to take effect April 27, 2020, until July 31, 2020. The unions cited, inter alia, the obvious threat of COVID-19 to workers around the country.

69.     On April 29, 2020, the Board's Executive Secretary advised that "the Board will be considering [SEIU's and AFL-CIO's] request as a petition for rulemaking, and it has been docketed as such."

70.     The Board has taken no further action on the petition to this day, despite the fact that tens of thousands of American workers have been sickened and killed by COVID-19 and continue to be killed by the virus's Delta variant.

71.     Many different kinds of workers have had to face serious health and safety threats during the pandemic. Poultry workers, fast food workers, grocery store employees, airport workers, manufacturing employees, truck drivers, building security guards, maintenance employees, and others have all had to consider whether and how they can perform their essential jobs while limiting their exposure to coronavirus to the extent possible.

72.     Temporary and agency workers labor in each of these industries, and workers in each of these industries have fallen ill and died because of coronavirus contracted at work.

73.     Yet the Board continues to blind itself to evidence of employer control (exercised and unexercised) over health and safety conditions and has failed to reconsider or even *explain* its approach in light of the pandemic, despite ample opportunity to do so.

74.     This constitutes arbitrary and capricious agency action, 5 U.S.C. § 706(2)(A), and the Final Rule should be set aside for this reason as well.

## COUNT I
### The Final Rule's Treatment of Reserved Control Is Contrary to the Common Law, Violates the NLRA, and Is Arbitrary and Capricious

75.     The allegations in paragraphs 1-74 are incorporated herein.

Case 1:21-cv-02443   Document 1   Filed 09/17/21   Page 18 of 20

76.    In 1947, Congress amended Section 2(3) of the Act and made clear that the NLRB was to use the common law of agency in interpreting both the statutory definition of "employee" and the statutory definition of "employer."

77.    As a consequence, in making its joint employer determinations, the Board must apply the common law of agency.

78.    The common law of agency looks to a putative joint employer's right to control terms and conditions of employment.

79.    Under the common law, the right to control includes the reserved, unexercised right to control employees' terms and conditions of employment.

80.    Under the Board's Final Rule, however, an employer's reserved, unexercised control alone, no matter how broad its scope, can never provide the basis for finding an employer to be a joint employer.

81.    This approach is contrary to the common law of agency, undermines national labor policy as stated in the NLRA, and draws arbitrary distinctions among employers.

82.    Accordingly, the Board's Final Rule must be set aside under the APA because the Rule is: not in accordance with law, 5 U.S.C. § 706(2)(A); in excess of statutory jurisdiction, authority, or limitations, and short of statutory right, 5 U.S.C. § 706(2)(C); and arbitrary, capricious, and an abuse of discretion, 5 U.S.C. § 706(2)(A).

## COUNT II
### The Board's Refusal to Include Safety and Health
### Conditions Among the Final Rule's Essential Terms and
### Conditions of Employment is Arbitrary, Capricious, and an Abuse of Discretion

83.    The allegations in paragraphs 1-82 are incorporated herein.

18

84.    In the Final Rule, the Board "expanded" but also "made exclusive" a list of essential terms and conditions of employment to be considered as part of the joint employment analysis.

85.    Commenters had urged the Board to include health and safety conditions on its list, but the Board did not do so and has taken no action in response to requests that it reconsider.

86.    The coronavirus pandemic has laid bare the centrality and materiality of workplace health and safety conditions. For example, for temporary workers assigned by agency employers to work in hospitals, the hospitals' control over personal protective equipment and safety protocols are not only among the matters "most material" to collective bargaining, they are literally a matter of life and death.

87.    Under these circumstances, the Board's exclusion of health and safety conditions from listed essential terms and conditions of employment in the Final Rule, and its failure to reconsider or even explain this exclusion as the pandemic continues to kill workers, are arbitrary, capricious, and an abuse of discretion under 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff requests that this Court enter judgment in its favor and:

1.  Declare that the Final Rule's failure to include appropriate consideration of an entity's reserved, unexercised control over essential terms and conditions of employment is contrary to the common law, contrary to the statute, and arbitrary and capricious in violation of the APA;

2.  Declare that the Final Rule's failure to include health and safety matters among the essential terms and conditions of employment is arbitrary, capricious and an abuse of discretion in violation of the APA;

3.  Vacate and set aside the *Final Rule on Joint Employer Status Under the National Labor Relations Act*;

4.  Issue a preliminary and permanent injunction barring the NLRB and its agents and employees from implementing and enforcing the Final Rule;

5.  Award Plaintiff costs, including reasonable attorney's fees; and

6.  Grant such other relief as is just and proper.


Dated: September 17, 2021                    Respectfully Submitted,


                                             */s/ Nicole G. Berner*
                                             Nicole G. Berner (Bar No. 472280)
                                             Claire Prestel (Bar No. 986766)
                                             John M. D'Elia (Bar No. 208782)
                                             Service Employees International Union
                                             1800 Massachusetts Avenue, N.W.
                                             Legal Department, Floor 6
                                             Washington, D.C. 20036
                                             (202) 730-7168
                                             nicole.berner@seiu.org
                                             claire.prestel@seiu.org
                                             john.delia@seiu.org

                                             Leon Dayan (Bar No. 444144)
                                             Adam Bellotti (Bar No. 1020169)
                                             Bredhoff & Kaiser, P.L.L.C.
                                             805 Fifteenth Street, N.W.
                                             Suite 1000
                                             Washington, D.C. 20005
                                             (202) 842-2600
                                             ldayan@bredhoff.com
                                             abellotti@bredhoff.com